# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

TYLER S. RILEY,
    Plaintiff,

    vs.

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant.

Case No. 1:18-cv-814
Litkovitz, M.J.

**ORDER**

Plaintiff Tyler S. Riley brings this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3)

for judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying his applications for disability insurance benefits ("DIB") and

supplemental security income ("SSI"). This matter is before the Court on plaintiff's statement of

errors (Doc. 17), the Commissioner's response in opposition (Doc. 25), and plaintiff's reply

memorandum (Doc. 28).

## I. Procedural Background

Plaintiff filed his applications for DIB and SSI in April 2015, alleging disability since

May 2, 2011[1] due to herniated disc, bipolar disorder, chronic kidney stones, anxiety, depression,

insomnia, post-traumatic stress disorder ("PTSD"), back condition, torn ACL in left knee,

degenerative disc with nerve root compression, bulging discs, and spinal stenosis. The

applications were denied initially and upon reconsideration. Plaintiff, through counsel, requested

and was granted a *de novo* hearing before administrative law judge ("ALJ") Peter Jamison on

December 5, 2017. Plaintiff and a vocational expert ("VE") appeared and testified at the ALJ

video hearing. On March 5, 2018, the ALJ issued a decision denying plaintiff's DIB and SSI

applications. Plaintiff's requests for review were denied by the Appeals Council on September

---

[1] Plaintiff later amended his onset date of disability to March 7, 2012. (Tr. 602).

21, 2018 and November 21, 2018, making the decision of ALJ Jamison the final administrative decision of the Commissioner.

## II. Analysis

### A. Legal Framework for Disability Determinations

To qualify for disability benefits, a claimant must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A) (DIB), 1382c(a)(3)(A) (SSI). The impairment must render the claimant unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2), 1382c(a)(3)(B).

Regulations promulgated by the Commissioner establish a five-step sequential evaluation process for disability determinations:

1) If the claimant is doing substantial gainful activity, the claimant is not disabled.

2) If the claimant does not have a severe medically determinable physical or mental impairment – *i.e.*, an impairment that significantly limits his or her physical or mental ability to do basic work activities – the claimant is not disabled.

3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.

4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.

5) If the claimant can make an adjustment to other work, the claimant is not disabled. If the claimant cannot make an adjustment to other work, the claimant is disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009) (citing 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 404.1520(b)-(g)). The claimant has the burden of proof at the first four

steps of the sequential evaluation process. *Id.*; *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 548 (6th Cir. 2004). Once the claimant establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that the claimant can perform other substantial gainful employment and that such employment exists in the national economy. *Rabbers*, 582 F.3d at 652; *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999).

## B. The Administrative Law Judge's Findings

The ALJ applied the sequential evaluation process and made the following findings of fact and conclusions of law:

1. The [plaintiff] meets the insured status requirements of the Social Security Act through September 30, 2019.

2. The [plaintiff] engaged in substantial gainful activity during the following periods: March 2012 through December 2012 (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. However, there has been a continuous 12-month period during which the [plaintiff] did not engage in substantial gainful activity. The remaining findings address the period the [plaintiff] did not engage in substantial gainful activity.

4. The [plaintiff] has the following severe impairments: degenerative disc disease of the lumbar spine with radiation to the right leg, chronic kidney stones, a right leg condition, asthma, and an anxiety disorder (20 CFR 404.1520(c) and 416.920(c)).

5. The [plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, [the ALJ] finds that the [plaintiff] has the residual functional capacity to perform a range of light work as defined in 20 CFR 404.1567(b) and 416.967(b) in that he can lift and carry up to twenty pounds occasionally and ten pounds frequently; stand and walk for about six hours in a workday; and sit for about six hours in a workday. He can occasionally balance, stoop, crouch, kneel, crawl, and climb stairs and ramps, but

never climb ladders, ropes, and scaffolds. He can only occasionally push and pull to operate foot pedals or other controls with either foot. He must avoid all exposure to hazards such as unprotected heights, dangerous machinery, and vibrations. He can operate [a] motor vehicle in work only occasionally. He must avoid all exposure to extremes of heat and cold and humid/wet working conditions. He must avoid concentrated exposure to dust, fumes, odors, and other pulmonary irritants. Due to his mental impairment, he is further restricted to simple, routine tasks, but not at a production rate pace. He can interact with supervisors and co-workers occasionally but can tolerate no interaction with the public. He can tolerate no more than ordinary and routine changes in the work setting and duties.

7. The [plaintiff] is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).[2]

8. The [plaintiff] was born [in] . . . 1986, and was 25 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date, as amended (20 CFR 404.1563 and 416.963).

9. The [plaintiff] has a high school equivalency certificate plus some college classes and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not an issue in this case because the [plaintiff]'s past relevant work is unskilled (20 CFR 404.1568 and 416.968).

11. Considering the [plaintiff]'s age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the [plaintiff] can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).[3]

12. The [plaintiff] has not been under a disability, as defined in the Social Security Act, from March 7, 2012, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 17-28).

---

[2] Plaintiff has past relevant work as an auto detailer/lot technician and auto assembler, both medium, unskilled positions. (Tr. 26, 344).
[3] The ALJ relied on the VE's testimony to find that plaintiff would be able to perform the requirements of representative light, unskilled occupations such as sorter (90,000 jobs in the national economy), packer (150,000 jobs in the national economy), and cleaner (180,000 jobs in the national economy). (Tr. 27, 345-46).

## C. Judicial Standard of Review

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g) and involves a twofold inquiry: (1) whether the findings of the ALJ are supported by substantial evidence, and (2) whether the ALJ applied the correct legal standards. *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see also Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007).

The Commissioner's findings must stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance. . . ." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court considers the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

The Court must also determine whether the ALJ applied the correct legal standards in the disability determination. Even if substantial evidence supports the ALJ's conclusion that the plaintiff is not disabled, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Rabbers*, 582 F.3d at 651 (quoting *Bowen*, 478 F.3d at 746). *See also Wilson*, 378 F.3d at 545-46 (reversal required even though ALJ's decision was otherwise supported by substantial evidence where ALJ failed to give good reasons for not giving weight to treating physician's opinion, thereby violating the agency's own regulations).

### D. Relevant Medical Evidence and Opinions

#### 1. Plaintiff's Physical Impairments

##### a. *Mercy Hospital Records*

Plaintiff was injured in June 2012 after hitting someone with his head and neck while playing football. He complained of right side back pain and swelling. (Tr. 999). An examination revealed tenderness and decreased range of motion in the lumbar spine with pain and spasms. (Tr. 1002). X-rays of the lumbar spine showed minimal degenerative changes at L4-L5 with loss of vertebral disc space height. (Tr. 1003). Plaintiff was assessed with a contusion of his back and lower back pain. Plaintiff received prescriptions for Robaxin, Naprosyn, and a Lidoderm patch. (Tr. 1014).

On November 21, 2012, plaintiff was seen in the emergency room for exacerbation of back pain. (Tr. 765). He exhibited tenderness, pain, and spasms in the lumbar spine. Plaintiff noted he had hand cellulitis and took more pain medication than prescribed. (Tr. 766). The emergency room doctor declined to prescribe narcotic pain medications after reviewing his OARRS database report showing plaintiff received 11 controlled substance prescriptions in the 12 months prior written by 8 different prescribers and was taking more pain medication than prescribed. (Tr. 768).

On April 29, 2017, plaintiff visited the emergency room for worsening kidney stone issues, including pain, nausea, vomiting. (Tr. 2174). Treatment notes indicated that plaintiff demanded Dilaudid for pain management and refused all other medications. Plaintiff was advised that Dilaudid is not the answer to his symptoms and he needed to follow-up with his urologist for a stent placement. (Tr. 2178). Plaintiff declined further treatment and was escorted off the property after he became combative, punched walls, screamed, and scared other patients

and nursing staff. Dr. Charlton, one of the emergency room doctors, noted that plaintiff was offered Toradol as well as IV lidocaine but refused to try either and refused to be examined. Dr. Charlton expressed concerns regarding potential death of plaintiff's kidney given the length of obstruction that he was likely to experience. (Tr. 2181). That same day, plaintiff went to Bethesda North Hospital emergency room complaining of right flank pain on a 10/10 scale with ongoing symptoms for over two weeks. Treatment notes indicate that plaintiff was diagnosed with a small non-obstructing right ureteral stone, but he had negative kidney, ureter, and bladder x-rays and ultrasounds. Treatment notes state that plaintiff left the Mercy Hospital emergency department against medical advice because they refused to prescribe Dilaudid. (Tr. 2472). The emergency room doctor gave plaintiff Dilaudid and noted he had significant improvement in his appearance and symptoms. The emergency room doctor told plaintiff she could not prescribe anything stronger than Percocet, and plaintiff needed to follow up with his urologist. (Tr. 2475).

> b. *Carol Marino, D.O.*

On June 22, 2012, plaintiff saw Dr. Carol Marino, D.O., for low back pain in the lumbar spine and sacroiliac related to his football injury. Plaintiff described his pain as aching, burning, and severe. His symptoms were aggravated by sitting and positioning, and he had associated numbness and paresthesias. Plaintiff reported that he tried analgesics and home exercises for his symptoms, but the treatment provided no relief. On examination, Dr. Marino found increased tissue texture and tenderness with decreased range of motion, especially in the right paraspinal muscles of L5 and the SI joints. (Tr. 645). Dr. Marino assessed lumbar degenerative disc disease and numbness of his feet. Dr. Marino referred plaintiff to an orthopedic surgeon. He received a Toradol injection and was prescribed hydrocodone and Flexeril. (Tr. 646).

Plaintiff returned to Dr. Marino for a follow-up visit on June 7, 2013. Dr. Marino noted that plaintiff did not follow up with the orthopedic surgeon because "he didn't want to pay the $200 initial consult fee because 'they would just do an x-ray which I already had done.'" (Tr. 649). He requested a letter stating that he was unable to work for the year because he could not afford to pay child support. Plaintiff complained of intermittent low back pain, but he did not have numbness and his legs did not give out. On examination, Dr. Marino found increased tissue texture and tenderness in the paraspinal muscles with decreased range of motion at L3-5. (*Id.*). Dr. Marino assessed chronic lumbar strain, decreased vertebral spacing on x-ray, and noncompliance with treatment or follow-up. Plaintiff was offered a Toradol injection and left to get money but never returned. (Tr. 650).

### c. *Mt. Orab Family Practice*

On May 8, 2014, plaintiff saw Andrew Scott, CFNP, for complaints of bilateral lower back pain with leg numbness and leg pain. Plaintiff described his pain as discomforting, sharp and stabbing. His symptoms were aggravated by bending, lifting, sitting and lifting. Plaintiff reported his pain started 2 years prior after he lifted tires at work and felt a pop in his back. Plaintiff stated he has trouble working due to back pain and swelling. His low back pain radiated up to the thoracic spine and out to the sacroiliac joints of his lumbar spine. Plaintiff described the numbness in his legs and feet as a tingling sensation and numbness in his right arm down to the tips of his fingers. (Tr. 2062). Mr. Scott noted that the 2012 x-ray of the lumbar spine from Mercy Hospital showed mild degenerative disc disease changes with loss of vertebral disc height. (*Id.*). Mr. Scott ordered a lumbar spine MRI and prescribed Gabapentin. (Tr. 2064).

On May 13, 2014, the lumbar spine MRI revealed a disc protrusion at L4-5 and degenerative retrolisthesis of L5 on S1 without nerve root compression. (Tr. 1093). On June 9,

2014, plaintiff saw Mr. Scott for review of the MRI. (Tr. 2066). A physical examination revealed tenderness and severe pain with motion of the thoracic and lumbar spines. (Tr. 2067). Plaintiff was prescribed Diclofenac, Gabapentin, and Trazodone and referred to a pain management clinic and a neurosurgeon. (*Id.*).

### d. *Michael Sharts, M.D.*

On July 5, 2014, plaintiff consulted with neurosurgeon Dr. Sharts. Plaintiff reported gradually worsening low back pain radiating to the right leg. (Tr. 714). Plaintiff rated his back-pain severity at a level of 9 and his right leg pain at a level of 5 on a 0-10 visual analog scale. (*Id.*). On physical examination, plaintiff exhibited tenderness to the right musculature of the back, negative straight leg raises, normal musculoskeletal range of motion, normal deep tendon reflexes, 5/5 strength, and stable joints. He retained the ability to walk on his heels and tiptoes without difficulty. (Tr. 716). Dr. Sharts reviewed the May 2014 lumbar spine MRI, which "shows an overall normal alignment of the lumbar spine and the reading states that he has a retrolisthesis of L5-S1." Dr. Sharts did "not agree with that [finding] as this is a completely normal alignment of the lumbar spine. He has some mild degenerative changes at the L4-5 and L5-S1 level without any significant nerve root compression or spinal stenosis at any level. There are no other tumors, fractures or pars defects that may be the cause of his low back pain." (*Id.*). Dr. Sharts assessed low back pain, prescribed Trazodone and Neurontin, and referred plaintiff to see the physical medicine and rehabilitation doctor. (*Id.*).

### e. *Magdalena Kerschner, M.D.*

Plaintiff consulted with pain management physician Dr. Kerschner on January 19, 2015, for complaints of right low back and leg pain. (Tr. 687). Plaintiff rated his pain severity at a level of 7-8 on a 0-10 visual analog scale. He used a cane. (*Id.*). Facet loading test was positive,

9

and Dr. Kerschner found bilateral SI joint tenderness. (Tr. 689). Dr. Kerschner diagnosed spondylosis, bilateral lumbar radiculopathy, and bilateral sacroiliitis. (*Id.*). Plaintiff received medial branch blocks at bilateral L2-3, L3-4, L4-5, and L5-S1. (Tr. 691).

### f. *Robert Bohinski, M.D.*

In March 2015, plaintiff consulted with another neurosurgeon, Dr. Bohinski. After reviewing plaintiff's medical history and the May 2014 MRI, he concluded that he did not see "a surgically correctable abnormality" and recommended non-surgical management of plaintiff's back issues. He advised plaintiff to continue pain management treatment. (Tr. 699-702).

### g. *Michael J. Kramer, M.D.*

Plaintiff underwent a lumbar spine MRI on August 5, 2015, which showed disc bulges at L4-L5 and L5-S1. (Tr. 918-19).

Plaintiff consulted with a third neurosurgeon, Dr. Kramer, on September 25, 2015, complaining of lower back and right leg pain. (Tr. 1086). On examination, plaintiff exhibited a normal gait and negative straight leg raising. He exhibited pain with lumbar flexion and extension, tenderness, and a positive, right femoral stretch. (Tr. 1087). He denied any drug use. (Tr. 1088). Dr. Kramer reviewed the August MRI study and confirmed the absence of nerve root impingement. Dr. Kramer noted that Epidurals and a TENS unit were ineffective. Dr. Kramer noted that plaintiff had a history of bipolar disorder treated by a psychiatrist and that plaintiff was taking Desyrel, Valium, Atarax, and Zofran, in addition to Neurontin and Tramadol. Plaintiff's mother voiced concern about depression and suicide risk. (Tr. 1089). Dr. Kramer noted that plaintiff was miserable, and he was uncertain that he could get plaintiff through physical therapy. Dr. Kramer recommended a spinal fusion at L4-L5 and L5-S1 and prescribed Norco. (Tr. 1090).

Dr. Kramer prepared a statement for the local county child support enforcement agency on September 28, 2015, opining that plaintiff would be unable to work from September 25, 2015, until March 25, 2016 due to lumbar spine degenerative disc disease, low back pain and retrolisthesis of vertebrae. (Tr. 1111).

h. *Kara Ciani, M.D.*

Plaintiff established care with primary care physician Dr. Ciani on September 1, 2015 and asked for a referral to a spine specialist. Plaintiff reported that he was seeing a psychiatrist for anxiety, and he was taking Valium, Trazodone, and Atarax. (Tr. 2029). On musculoskeletal examination, plaintiff exhibited 5/5 strength of flexors and extensors bilaterally, and he was tender to palpation of L4-L5 at the right transverse processes and right paraspinal muscles. Plaintiff had normal flexion, extension, and rotation of spine, and his straight leg test was negative. He exhibited normal range of motion of bilateral hips and 5/5 strength in flexors and extensors of lower extremities bilaterally. On mental status examination, he had a flat affect and congruent mood, mildly saddened. Dr. Ciani assessed lumbar back pain and noted that she would discuss his anxiety/PTSD at the next visit. Dr. Ciani referred him to a physical therapist and to a surgeon for evaluation. (Tr. 2032).

On February 26, 2016, plaintiff had a follow-up with Dr. Ciani for back pain. Plaintiff reported that he saw an orthopedic surgeon and was going to pursue spine surgery, but he was dismissed from the clinic due to a history of pain medications. (Tr. 2025). Plaintiff requested a referral for a second opinion to pursue surgery, but he had not yet followed up with physical therapy. Plaintiff reported that his back pain only improves in a reclining chair and worsens with walking or exercise. He reported being unable to work due to an inability to stand on his feet. (*Id.*). On examination, plaintiff exhibited a positive right straight leg raise with back tenderness

11

and limited motion due to pain. Dr. Ciani referred him to a new surgeon for a second opinion. (Tr. 2027).

On March 21, 2016, plaintiff reported that his pain was unchanged. Plaintiff reported that he saw physical therapy and they would not complete disability paperwork. (Tr. 2021). Plaintiff exhibited significant pain with large movements and was most comfortable lying supine. On mental status examination, plaintiff exhibited an irritated mood, flat affect, hyperawareness of pain/movement, normal thought content, and fair insight. Dr. Ciani assessed lumbar degenerative disc disease and right-sided low back pain with sciatica. Dr. Ciani noted plaintiff was "agreeable to not obtaining pain medications at this office as he already has a contract with his Urologist." (Tr. 2023).

On March 21, 2016, Dr. Ciani prepared a disability statement for the local county child support enforcement agency stating that plaintiff would be unable to work for a one-month period pending a physical therapy evaluation and treatment. (Tr. 2168).

### i. *Michael T. Reister, PT*

Plaintiff underwent a functional capacity evaluation with physical therapist, Michael Reister, on April 18, 2016. (Tr. 2128-63). Based on that evaluation, Mr. Reister completed a Medical Source Statement in which he opined that plaintiff could sit for 15 minutes at a time for a total of 4-5 hours and stand/walk for less than 15 minutes at a time for a total of less than 1 hour. (Tr. 2122-24). Mr. Reister found that plaintiff would need a rest period in addition to normal breaks for the purpose of relieving pain. (Tr. 2124).

### j. *Doug Portmann, D.C.*

Plaintiff began chiropractic treatment for his lower back pain in August 2017. Dr. Portmann assessed segmental and somatic dysfunction of the lumbar, sacral, and thoracic regions

12

and back pain.  Dr. Portmann found plaintiff's condition was acute and chronic.  Dr. Portmann manipulated the thoracic region, lumbar region and lumbo-sacral region of plaintiff's back. Plaintiff's treatment plan included three visits per week for four weeks.  (Tr. 2452).  Plaintiff continued to treat with Dr. Portmann through at least November 13, 2017.  (Tr. 2543-47).

On November 20, 2017, Dr. Portmann opined that based on the diagnosis of low back pain with radiculopathy, plaintiff could only sit, stand or walk for only for one hour at a time. (Tr. 2504).  Dr. Portmann opined that plaintiff cannot lift more than 20 pounds.  (Tr. 2505).  Dr. Portmann noted that plaintiff is unable to sleep because of nerve impingement and low back pain.  (Tr. 2502).

### k.  *State Agency Reviewing Physicians*

In August 2015, state agency physician James Cacchillo, D.O., reviewed the record and found that plaintiff was capable of light work except that he could frequently balance; he could occasionally climb ramps/stairs, kneel, crouch, crawl or stoop; but he could never climb ladders/ropes/scaffolds.  He should avoid heavy machinery and unprotected heights.  (Tr. 359-61).  Dr. Cacchillo based these limitations on plaintiff's degenerative disc disease.  (*Id.*).  Dr. Cacchillo also noted that the evidence showed that plaintiff is focused on pain medication, and a neurosurgeon did not see a surgically correctable abnormality that correlated with plaintiff's stated symtoms.  (Tr. 361).  In January 2016, Dr. Venkatachala Sreenivas, M.D., reviewed the record for reconsideration purposes and affirmed Dr. Cacchillo's assessment.  (Tr. 392-93).

### 2.  Plaintiff's Mental Impairments

### a.  *Greater Cincinnati Behavioral Health Services*

On February 29, 2016, plaintiff began mental health treatment with Sarah Porter, LISW, at Greater Cincinnati Behavioral Health Services.  Plaintiff was extremely anxious and reported

that a previous psychiatrist discontinued care over a dispute regarding his request for medical records. (Tr. 2052). On mental status examination, plaintiff exhibited an anxious-depressed mood, racing thoughts, restless behavior, and impaired attention/concentration. (Tr. 2055). Plaintiff also described symptoms of bipolar disorder as having extremes in emotions. Plaintiff was assessed with unspecified bipolar and related disorder with anxious distress, severe. (Tr. 2059). Ms. Porter recommended community support services, medication management, and counseling. (*Id.*). On March 22, 2016, plaintiff's case manager noted that plaintiff was on the psychiatry waitlist and she would request that plaintiff's primary care physician prescribe psychiatric medication until he could see a psychiatrist. (Tr. 2048).

Plaintiff saw Amy Trent, CNP, on November 3, 2016 for therapy. Plaintiff reported symptoms of mania and obsessive-compulsive disorder. (Tr. 2438). Plaintiff discussed an incident when he was arrested on a child support warrant and developed PTSD while in jail. (*Id.*). On mental status examination, Ms. Trent observed rapid and pressured speech and anxious/depressed mood. Ms. Trent assessed Bipolar I disorder, most recent episode depressed, and she prescribed Risperdal. (Tr. 2440). On December 8, 2016, Ms. Trent reported plaintiff's difficulty sitting comfortably, wiggling around in the seat. Plaintiff exhibited rapid and pressured speech, anxiety, and depression. (Tr. 2434). Ms. Trent discontinued Risperdal and prescribed Seroquel and Valium. (Tr. 2435). On February 9, 2017, Ms. Trent noted medication compliance, but plaintiff was functioning minimally due to chronic pain and kidney stones. Ms. Trent noted that plaintiff's mood had improved, but he struggled with chronic pain, financial strain, and family illnesses. During the mental status examination, plaintiff was sitting on the edge of his seat and changing positions often due to chronic pain but was otherwise calm and cooperative. (Tr. 2427). On March 2, 2017, Ms. Trent noted that plaintiff was depressed,

nervous, in extreme pain, and tearful and emotional due to a visitation schedule with his daughter. (Tr. 2423). Plaintiff reported that his "heart is racing and [his] mind keeps going." (*Id.*).

On March 21, 2017, plaintiff saw his case manager and reported that his medication was not working. The case manager reported, "During the visit, [plaintiff] became visibly shaky and fell to the floor out of his chair becoming unresponsive but breathing. Nurses were called and [plaintiff] was assessed for possible panic attack." (Tr. 2419). On March 22, 2017, Ms. Trent observed plaintiff as "obviously anxious" when discussing his custody situation with his daughter. (Tr. 2417). Ms. Trent changed his medication and prescribed Seroquel, Klonopin, and Effexor. (Tr. 2418). By June 23, 2017, during a meeting with his case manager, plaintiff reported that he had been doing activities with his daughter and son. Plaintiff reported that his current medications were managing his symptoms of anxiety and depression. (Tr. 2408).

### b. *Regina McKinney, Psy.D.*

On August 25, 2015, plaintiff underwent a consultative mental evaluation with Dr. McKinney. (Tr. 1041-46). Plaintiff stated that the nature of his disability was back issues, anxiety and sleep, bipolar disorder, depression, and kidney stones. (Tr. 1042). On mental status examination, plaintiff appeared anxious and displayed minimal eye contact but no other significant mood disturbances. He had adequate energy, spoke clearly, and exhibited clear and logical thought processes. Dr. McKinney found no mental content abnormalities. Plaintiff exhibited appropriate affect, was fully oriented, and had sufficient judgment and adequate insight. (Tr. 1043-44). Dr. McKinney concluded that plaintiff's anxiety could interfere with his ability to remember and complete multi-step instructions, result in increased worrying, and result in decreased attention and concentration. Dr. McKinney further opined that depressive

15

symptomatology may slow plaintiff's work pace, and he may have some difficulties coping with major changes in his routine. (Tr. 1045-46).

### c. *State Agency Reviewing Psychologists*

In September 2015, state agency psychologist Laura Eckert, Ph.D., reviewed plaintiff's file and concluded that he was mildly restricted in activities of daily living; experienced moderate difficulties in maintaining social functioning; had moderate difficulties in maintaining concentration, persistence, or pace; and had experienced no episodes of decompensation of extended duration. (Tr. 357). Dr. Eckert gave Dr. McKinney's consultative evaluation great weight and found that her opinion was reasonable and generally consistent with the objective evidence. (Tr. 359). Dr. Eckert found that plaintiff can perform 1-4 step work tasks without strict, fast-paced production demands; can maintain superficial interaction with co-workers, supervisors, and the general public; and can perform work in a relatively static setting without frequent and major changes in job duties. (Tr. 362-63). In January 2016, state agency psychologist, Courtney Zeune, Psy.D., reviewed plaintiff's file upon reconsideration and affirmed Dr. Eckert's assessment. (Tr. 404-05, 408-09).

### E. Specific Errors

On appeal, plaintiff argues that: (1) the ALJ failed to properly weigh the medical opinions of record; (2) the ALJ incorrectly found that plaintiff was engaged in substantial gainful activity after the alleged onset date; and (3) the case was adjudicated by an improper and unconstitutionally appointed ALJ and should be remanded for a new hearing. (Doc. 17).

### 1. First Assignment of Error

Plaintiff first argues that the ALJ erred in concluding that the findings of the state agency reviewing physicians supported the RFC determination that plaintiff could sit six hours and

stand/walk six hours. (Doc. 17 at 22). Plaintiff argues that the more-recent opinions of physical therapist Reister and treating chiropractor Dr. Portmann suggest that he suffers from substantial limitations greater than assessed in the RFC. (*Id.*). Plaintiff cites Mr. Reister's conclusion that plaintiff could sit for 15 minutes at a time for a total of 4-5 hours, and stand/walk for less than 15 minutes at a time (followed by 15 minutes of reclining) for a total of less than 1 hour. (*Id.*) (citing Tr. 2122-24). Plaintiff also cites Dr. Portmann's medical source statement, which opined that plaintiff could sit for one hour at a time, stand for one hour at a time, and walk for one hour at a time, as well as his conclusion that plaintiff would be limited by exacerbations of his condition. (*Id.*) (citing Tr. 2504-05).

In weighing the physical opinion evidence of record, the ALJ gave "little weight" to the April 18, 2016 functional capacities evaluation and medical source statement completed by plaintiff's physical therapist, Michael Reister. (Tr. 25-26). The ALJ noted that Mr. Reister concluded that plaintiff would be unable to perform work on a full-time basis. (*Id.* at 26). However, the ALJ considered that Mr. Reister only saw plaintiff for that evaluation and not for continuing treatment, and the limitations described in his report were not supported by the diagnostic studies or the findings of any other treating source. (*Id.*). The ALJ likewise gave "little weight" to the November 2017 medical source statement of plaintiff's chiropractor, Dr. Portmann. The ALJ noted that Dr. Portmann was not an acceptable medical source and that his opinion was based on "nerve impingement" in plaintiff's spine, which was not supported by the lumbar spine MRI studies in the record. The ALJ also noted that Dr. Portmann's limited treatment notes did not suggest severe limitations. (*Id.*). The ALJ found that the state agency reviewing physicians' opinions that plaintiff could perform a range of simple, routine, and light work supported his RFC determination. (*Id.*).

Under the Social Security regulations, evidence from an "acceptable medical source" is required to establish the existence of a medically determinable impairment. 20 C.F.R. §§ 404.1513(a), 416.913(a); SSR 06–03p, 2006 WL 2329939, at *2.[4] Acceptable medical sources include licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). However, evidence from "other sources" as defined under the regulations may be used to show the severity of the claimant's impairment and how it affects the individual's ability to work. 20 C.F.R. §§ 404.1513(d), 416.913(d); SSR 06-03p. Other sources include opinions from medical sources such as chiropractors and physical therapists. 20 C.F.R. §§ 404.1513(d)(1), 416.913(d)(1). Factors to be considered in evaluating opinions from "other sources" who have seen the claimant in a professional capacity include how long the source has known the individual, how frequently the source has seen the individual, how consistent the opinion of the source is with other evidence, how well the source explains the opinion, and whether the source has a specialty or area of expertise related to the individual's impairment. SSR 06-03p. *See also Barrett v. Comm'r of Soc. Sec.*, No. 3:16-cv-00119, 2017 WL 2790666, at *4 (S.D. Ohio June 28, 2017). The ALJ "should *explain* the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the [ALJ's] reasoning, when such opinions may have an effect on the outcome of the case." SSR 06-03p.

---

[4] SSR 06-03p has been rescinded in keeping with amendments to the regulations that apply to claims filed on or after March 27, 2017, and the rescission is effective for claims filed on or after that date. 82 FR 15263-01, 2017 WL 1105348 (March 27, 2017). Because plaintiff's claim was filed before the effective date of the rescission, SSR 06-03p applies here.

The ALJ's decision to give "little weight" to the opinions of Mr. Reister and Dr. Portmann is supported by substantial evidence. The ALJ correctly assessed that Dr. Portmann, a chiropractor, is not an "acceptable medical source" and therefore his opinion was not entitled to any special deference. (Tr. 26). "The opinion of a 'non-acceptable medical source' is not entitled to any particular weight or deference—the ALJ has discretion to assign it any weight he feels appropriate based on the evidence of record." *Noto v. Comm'r of Soc. Sec.*, 632 F. App'x 243, 248-49 (6th Cir. 2015) (citing *Walters v. Commissioner of Social Sec.*, 127 F.3d 525, 530 (6th Cir. 1997)). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 541 (6th Cir. 2007) (ALJ has discretion to determine proper weight to accord opinions from "other sources"). In addition, the ALJ was not required to give any special deference to the opinion of Mr. Reister, a physical therapist who only evaluated plaintiff on one occasion.

The ALJ also appropriately considered the length and frequency of treatment and the consistency of Mr. Reister and Dr. Portmann's opinions with the other evidence. The ALJ explained that Mr. Reister rendered his medical source statement based on a one-time evaluation. The ALJ recognized that Dr. Portmann was plaintiff's treating chiropractor. Nevertheless, the ALJ concluded that both opinions were not supported by record findings. The ALJ reasonably concluded that Dr. Portmann's finding that plaintiff suffered from "nerve impingement" of the spine was not supported by MRI studies. (Tr. 668—emergency room physician noted that plaintiff's May 2014 MRI showed no nerve root impingement; Tr. 716—Dr. Sharts noted that plaintiff's May 2014 MRI showed no significant nerve root compression; Tr. 1089—Dr. Kramer noted that August 2015 MRI showed absence of nerve root impingement). The ALJ also reasonably found that the limitations described by Mr. Reister were "not supported by the diagnostic studies or the findings of any other source treating the [plaintiff]." (Tr. 26). The ALJ

conducted a thorough review of the medical evidence of record prior to weighing Mr. Reister's opinion and noted several normal examination and diagnostic findings. (Tr. 714-16—Dr. Sharts found negative straight leg raising, normal gait, normal ranges of motion in July 2014; Tr. 1086-1090—Dr. Kramer found that plaintiff had a normal gait and negative straight leg raising in September 2015 and noted that the recent MRI study showed no nerve root impingement).

Overall, the ALJ provided an adequate explanation for the weight afforded to Mr. Reister and Dr. Portmann, and it was appropriate for the ALJ to accord greater weight to the state agency reviewing physicians. *Gayheart*, 710 F.3d at 379-80 (citing SSR 96-6p, 1996 WL 374180, at *3) (When warranted, the opinions of agency medical and psychological consultants "may be entitled to greater weight than the opinions of treating or examining sources."). *See also Wisecup v. Astrue*, No. 3:10-cv-325, 2011 WL 3353870, at *7 (S.D. Ohio July 15, 2011) (Ovington, M.J.) (Report and Recommendation), *adopted*, 2011 WL 3360042, at *7 (S.D. Ohio Aug. 3, 2011) ("opinions of non-examining state agency medical consultants have some value and can, under some circumstances, be given significant weight").

Plaintiff also argues in his first assignment of error that the ALJ failed to comply with Social Security Ruling 13-2p in assessing his alleged abuse of controlled substances. (*Id.*). Plaintiff also contends that the ALJ failed to consider that his mother requested controlled substances from various sources. (*Id.*).

Social Security Ruling 13-2p governs the evaluation of cases involving drug addiction and alcoholism ("DAA"). SSR 13-2p, 2013 WL 621536 (Feb. 20, 2013), *amended*, March 22, 2013. SSR 13-2p provides that the analysis of whether DAA is a contributing factor material to the disability determination is to be applied when a claim includes evidence from "acceptable medical sources . . . establishing that DAA is a medically determinable impairment(s)." *Id.* at *2

20

(citing 20 C.F.R. §§ 404.1513, 416.913). The ALJ makes a DAA materiality determination only when: (1) there is "medical evidence from an acceptable medical source establishing that a claimant has a Substance Use Disorder," and (2) the claimant is found to be disabled "considering all impairments, including the DAA." *Id.* at *4.

In this case, the ALJ fully complied with SSR 13-2p, which requires a disability finding as a prerequisite to the application of the DAA materiality determination. The regulations require that the ALJ "first determine whether a claimant suffers from a disability before proceeding – if necessary – to a determination of whether the substance abuse is a 'contributing factor material to the determination of disability.'" *Cook v. Commissioner of Social Security*, No. 15-cv-592, 2016 WL 3944757, at *9 (S.D. Ohio June 29, 2016) (Report and Recommendation), *adopted*, 2016 WL 3945695 (S.D. Ohio July 19, 2016) (citing 20 C.F.R. §§ 404.1535, 416.935)). While the ALJ discussed pieces of evidence suggesting plaintiff's drug-seeking behavior (Tr. 22, 24), the ALJ did not find that plaintiff's purported drug abuse constituted a medically determinable impairment and ultimately found plaintiff to not be disabled. *Sullinger v. Astrue*, No. CIV. 12-231, 2014 WL 1331163, at *4 (E.D. Ky. Mar. 31, 2014) (had the ALJ "sought to justify denying disability on a finding that [the plaintiff] was suffering from DAA then [SSR 13-2p] would apply"). Plaintiff's perfunctory citation to *Weber v. Comm'r of Soc. Sec.*, is unpersuasive for this reason. *Weber v. Comm'r of Soc. Sec.*, No. 1:12-CV-550, 2013 WL 3148337, at *4 (S.D. Ohio June 19, 2013) (Report and Recommendation), *adopted*, 2013 WL 5389223 (S.D. Ohio Sept. 25, 2013). Unlike in *Weber*, the ALJ in this case did not "improperly discount[ ] the plaintiff's symptoms based upon his alleged drug-seeking behavior." *Id.* Rather, the ALJ cited pieces of evidence indicating plaintiff's drug-seeking behavior but ultimately concluded that the objective medical evidence did not support a

21

disability finding. Because the ALJ first found that plaintiff's symptoms, including the drug-seeking visits, did not preclude sustained work, the ALJ was not required to conduct a DAA materiality determination under SSR 13-2p.

Moreover, plaintiff's argument that the ALJ erred by not citing certain records, which he states demonstrate that his mother demanded controlled substances at the emergency room on two occasions, is unavailing. (Doc. 17 at 23) (citing Tr. 2211, 2336, 2340). An ALJ is not required to directly address in his written decision every piece of evidence submitted by a party. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006). Moreover, even if the record supports that plaintiff's mother requested Dilaudid for plaintiff on two occasions (Tr. 2211, 2336, 2340), the ALJ's discussion of other incidents of plaintiff's drug-seeking behavior is still valid. (Tr. 22—discussing an April 29, 2017 emergency room visit where plaintiff demanded Dilaudid and refused all other treatment; Tr. 24—discussing April 9, 2017 emergency room notes indicating drug-seeking behavior).

Finally, plaintiff argues that the ALJ failed to consider that his non-compliance with psychiatric treatment was a result of his bi-polar disorder and financial hardship. (Doc. 17 at 24). In evaluating a claimant's statements regarding the intensity, persistence, and limiting effects of symptoms in disability claims, an ALJ may consider several reasons why a plaintiff may not have pursued treatment, including cost, religious beliefs, and mental impairments. Social Security Ruling 16-3p, 2017 WL 5180304, at *10 (Oct. 25, 2017). Plaintiff, however, has failed to establish reversible error with respect to the ALJ's discussion of non-compliance with treatment. The ALJ cited to treatment notes indicating plaintiff's non-compliance with psychiatric treatment but ultimately did not factor any alleged non-compliance with treatment when considering plaintiff's statements about the intensity, persistence, and limiting effects of

his symptoms. Rather, the ALJ reasonably considered that plaintiff's subjective statements were inconsistent with objective clinical findings. (Tr. 24). The ALJ also cited plaintiff's inconsistent statements on marijuana use, as well as drug-seeking behavior. (Tr. 24-25). Plaintiff has not challenged the ALJ's consideration of these three factors in assessing his subjective complaints of disabling limitations.[5] Based on the foregoing, plaintiff's first assignment of error is overruled.[6]

## 2. Second Assignment of Error

Plaintiff argues as his second assignment of error that the ALJ erred by finding that he was engaged in substantial gainful activity after the alleged onset date. (Doc. 17 at 25). Plaintiff states that any work performed after the amended alleged onset date of March 7, 2012 only averaged $1,206.68 per month, which is lower than the 2019 statutory substantial gainful activity amount of $1,220. (Id.). In response, the Commissioner argues that assuming plaintiff's calculations are correct, his earnings between March and December 2012 would have exceeded $1,010 per month, which was the monthly substantial gainful activity amount for non-blind individuals in 2012. (Doc. 25 at 2). The Commissioner argues that plaintiff's reliance on the 2019 substantial gainful activity threshold is irrelevant to the period at issue in this case. (Id.).

The Court agrees with the Commissioner that the ALJ properly found that plaintiff was engaged in substantial gainful activity after the alleged onset date. The ALJ concluded that "the

---

[5] While plaintiff challenges the ALJ's consideration of his drug-seeking behavior in connection with SSR 13-2p, he fails to challenge it with regard to the ALJ's evaluation of his subjective complaints of disabling limitations. Therefore, any such argument is deemed waived.

[6] In his statement of errors, plaintiff states that the ALJ erred in failing to "solicit further opinion evidence" but fails to develop this argument or provide any analysis. Therefore, any such argument is waived. *See Kuhn v. Washtenaw County*, 709 F.3d 612, 624 (6th Cir. 2013) (The Sixth Circuit "has consistently held that arguments not raised in a party's opening brief, as well as arguments adverted to in only a perfunctory manner, are waived.") (internal citations omitted).

evidence establishes that the [plaintiff] engaged in substantial gainful activity from his alleged onset date of March 7, 2012 through December 2012." (Tr. 18). As the ALJ noted, plaintiff's earning records show that he worked several jobs in 2012 after the amended alleged onset date, with 2012 earnings totaling $14,532.37. (Tr. 17) (Tr. 508-09). In 2012, the relevant period in question, the threshold amount for substantial gainful activity was $1,010 per month. *See* Substantial Gainful Activity, https://www.ssa.gov/oact/cola/sga.html (last visited Mar. 10, 2020). Therefore, under the ALJ's calculation, plaintiff's monthly income would have totaled $1,211.03, which the ALJ properly concluded exceeded the substantial gainful activity threshold for 2012. Plaintiff, however, notes that he actually earned $10,860.09 in 2012 because the earnings from the first job listed in the 2012 earnings report occurred prior to the alleged onset date of March 7, 2012. Even under plaintiff's calculation of $10,860.09, he would have earned an average of $1,086.09 per month between March and December 2012 and would have still been above the substantial gainful activity threshold for 2012. Plaintiff's argument is without merit. Therefore, plaintiff's second assignment of error is overruled.

### 3. Third Assignment of Error

As his final assignment of error, plaintiff argues that this matter should be remanded because the ALJ that heard plaintiff's application for benefits was unconstitutionally appointed under the U.S. Supreme Court's recent decision in *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2051 (2018), which addressed the appointment of S.E.C. officers under the Appointments Clause of the United States Constitution. (Doc. 17 at 25-26). Plaintiff argues that he has timely raised this issue as "there is no requirement of issue exhaustion before the Agency." (*Id.* at 27).

Plaintiff's arguments are foreclosed by the undersigned's decision holding that a social security claimant's failure to raise an Appointment Claims claim during the administrative

process amounts to a forfeiture of that claims, as well as other decisions in the Southern District of Ohio holding the same. *See Willis v. Comm'r of Soc. Sec.*, No. 1:18-CV-158, 2018 WL 6381066, at *1 (S.D. Ohio Dec. 6, 2018) (Report and Recommendation) (Litkovitz M.J.), *adopted*, 2019 WL 5690610 (S.D. Ohio Nov. 4, 2019); *Hodges v. Comm'r of Soc. Sec.*, No. 1:18-CV-394, 2019 WL 1330847, at *4 (S.D. Ohio Mar. 25, 2019); *Flack v. Comm'r of Soc. Sec.*, No. 2:18-CV-501, 2018 WL 6011147, at *2 (S.D. Ohio Nov. 16, 2018) (Report and Recommendation), *adopted*, 2019 WL 1236097 (S.D. Ohio Mar. 18, 2019); *Gossett v. Comm'r of Soc. Sec.*, No. 2:18-CV-999, 2019 WL 2105875, at *3 (S.D. Ohio May 14, 2019) (Report and Recommendation), *adopted*, 2019 WL 2514854 (S.D. Ohio June 18, 2019). Like the plaintiffs in these cases, the plaintiff in this case did not contest the validity of the ALJ's appointment or even mention the constitutional issue at the administrative level. Moreover, the Court disagrees with plaintiff that it would have been futile for him to present an Appointments Clause challenge to the ALJ at the administrative level. Plaintiff relies on an emergency message issued by the Social Security Administration in July 2018, which he characterizes as the SSA "acknowledg[ing] their ALJs as inferior officers were not constitutionally appointed." (Doc. 17 at 26). Plaintiff appears to allege that because his hearing was held on December 5, 2017 and the emergency message was issued on July 16, 2018, it would have been futile for him to raise an Appointments Clause challenge at the administrative level. (*Id.* at 27). This exact argument was rejected by the undersigned and courts within the Southern District of Ohio in the cases above. As most recently explained by Chief Judge Marbley:

> By failing to raise the challenge at the administrative level or before the ALJ's decision became final, Plaintiff's Appointments Clause challenge was not done in a timely manner. The emergency message did nothing to bar Plaintiff from raising her challenge and preserving it for judicial review. Regardless of what the message dictated or prohibited, Plaintiff still could have raised her Appointments Clause

25

challenge before the ALJ for the purpose of preserving the issue for later review. *Flack*, 2019 WL 1236097, at *3. *See also Hodges*, 2019 WL 1330847, at *4. The Court declines to consider the contrary authority cited by plaintiff in his statement of errors and reply brief, all of which is outside the Sixth Circuit and Southern District of Ohio. Therefore, because plaintiff did not raise his Appointments Clause challenge at the administrative level, he has forfeited his ability to bring this claim in this Court. Plaintiff's third assignment of error is overruled.

## IT IS THEREFORE ORDERED THAT:

The decision of the Commissioner is **AFFIRMED** and this case is closed on the docket of the Court.

Date: 3/20/2020

Karen L. Litkovitz
United States Magistrate Judge